OMAR EARLINGTON, JR., ET AL. *v.* ANTHONY ANASTASI ET AL.
(SC 18042)
(SC 18044)

Rogers, C. J., and Norcott, Palmer, Zarella and McLachlan, Js.

Argued May 28—officially released August 25, 2009

*Jeffrey R. Babbin*, with whom were *James B. Rosenblum* and, on the brief, *Bonnie L. Patten*, for the appellants (defendants).

*Kathleen L. Nastri*, with whom, on the brief, was *Cynthia C. Bott*, for the appellees (plaintiffs).

*Opinion*

McLACHLAN, J. In this medical malpractice appeal, the defendants, Anthony Anastasi, an obstetrician, and F.A.L. Medical Associates, P.C.,[1] appeal from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiffs,[2] Omar Earlington, Jr. (Omar), Tamar Earlington (Tamar) and Omar Earlington. On appeal,[3] the defendants claim that the trial court

[1] Saint Francis Hospital and Medical Center also was named as a defendant, but the claims against it were withdrawn prior to trial and it is not a party to this appeal.

[2] Omar Earlington and Tamar Earlington brought this action individually and on behalf of their minor son, Omar Earlington, Jr. Omar Earlington withdrew his claims prior to trial and is not a party to this appeal. We refer to Tamar Earlington and Omar Earlington, Jr., collectively as the plaintiffs and individually by name.

[3] The defendants appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

After the defendants appealed (SC 18042), the trial court issued its memorandum of decision regarding the plaintiffs' motion for judgment with inter-

improperly: (1) included specifications of negligence in the jury interrogatories that the court previously had ruled were not supported by the evidence; (2) permitted the jury to consider specifications of negligence in the jury interrogatories that were not supported by the evidence; (3) failed to order a new trial on the ground that the jury's responses to the interrogatories were internally inconsistent; and (4) failed to order a remittitur of the economic damages awarded to Omar. We disagree with the defendants' first three claims, and, accordingly, affirm the judgment as to liability. Because we conclude that the evidence does not support the jury's award of economic damages, however, we remand the case to the trial court for further proceedings.

On April 10, 2002, Tamar went into labor and presented to Saint Francis Hospital and Medical Center in Hartford for the delivery of Omar. At approximately 8 a.m. the following morning, Tamar had become fully dilated and was instructed to begin pushing. During the delivery, Omar began to experience decelerations of his heart. After observing continuing decelerations, Anastasi utilized a vacuum extractor to facilitate Omar's delivery. Anastasi applied the vacuum extractor to Omar's head and pulled down on the device during each of the following six contractions. Anastasi then cut an episiotomy and delivered Omar's head. Anastasi then discovered that Omar was experiencing a condition known as a shoulder dystocia, which means that Omar's shoulder was stuck behind Tamar's pubic bone. In order

est. The defendants then filed a second appeal (SC 18044), which was identical to the first appeal. Because a decision to award such interest pursuant to General Statutes § 52-192a is severable from the proceedings on the merits and does not require the exercise of discretion; *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.,* 239 Conn. 708, 752, 687 A.2d 506 (1997); we conclude that the defendants' first appeal was jurisdictionally proper, and, therefore, that the second appeal is merely redundant. See *Hall* v. *Bergman,* 106 Conn. App. 660, 662 n.2, 943 A.2d 515, cert. denied, 287 Conn. 911, 950 A.2d 1287, cert. granted, 287 Conn. 911, 950 A.2d 1287 (2008).

to dislodge the shoulder, Anastasi instructed the nurses to pull back on Tamar's legs while he applied suprapubic pressure, which is known as the McRoberts maneuver. Anastasi then unsuccessfully applied downward pressure on Omar. After that attempt failed, Anastasi rotated Omar 180 degrees, which is known as the Woods rotational maneuver, and again applied downward pressure on Omar. After these maneuvers were unsuccessful, Samuel Vigneri, a senior attending physician, intervened and was able to manipulate Omar's other arm and to deliver him successfully. Subsequent to the delivery, Omar was diagnosed as having Erb's Palsy, which is a paralysis of the arm that results from injury to an arrangement of nerves known as the brachial plexus.

On April 19, 2004, the plaintiffs initiated an action against the defendants alleging various acts of negligence and seeking damages for physical and emotional injuries. The allegations in the amended complaint, which were later transcribed verbatim into the jury interrogatories, alleged that Anastasi: (a) failed to adequately and properly assess Tamar for risk factors of shoulder dystocia and/or pelvic adequacy; (b) failed to recognize that Tamar had a small pelvis; (c) failed to perform a clinical pelvimetry during labor; (d) failed to adequately and properly evaluate Omar's size in utero; (e) improperly used a vacuum extractor for attempted delivery of Omar; (f) failed to perform a timely cesarean section; (g) applied excessive traction, pressure and/or torsion to Omar following the occurrence of a shoulder dystocia; and (h) failed to maintain accurate and adequate medical records. During the course of a jury trial, the defendants filed a motion for a directed verdict. Following trial, the trial court accepted the jury's verdict finding the defendants liable. The jury awarded $1,588,000 in economic damages and $1 million in noneconomic damages to Omar.[4] On November 8, 2006, the

---

[4] The jury also awarded Tamar $108,000 for noneconomic damages. The defendants do not appeal from that award.

defendants renewed their request for a directed verdict and filed a motion for judgment notwithstanding the verdict, and, in the alternative, the defendants requested a new trial or a reduction in the award. On May 16, 2007, the trial court issued its memorandum of decision denying the defendants' postverdict motions. This appeal followed.

I

We first address the defendants' claims that the trial court improperly submitted several interrogatories to the jury for deliberation. The defendants make two separate but related claims. First, the defendants claim that the trial court improperly included interrogatories that the parties had agreed not to submit to the jury. As noted previously in this opinion, the plaintiffs claimed eight acts of negligence denoted in the jury interrogatories as alphabetical letters ranging from (a) to (h). Prior to the submission of the interrogatories to the jury, the parties agreed to omit interrogatories (b) and (h), which referred to whether Anastasi recognized that Tamar had a small pelvis and whether Anastasi failed to maintain accurate medical records, respectively. In addition, the parties agreed to amend interrogatory (g), which referred to whether Anastasi applied excessive traction, pressure and/or torsion to Omar following the occurrence of a shoulder dystocia by deleting reference to "pressure and/or torsion" and leaving the application of excessive "traction" as the sole basis for the interrogatory. The jury, however, received an unmodified set of interrogatories that included interrogatories (b) and (h) and an unmodified interrogatory (g). We agree that the submission of these interrogatories to the jury was improper, but we conclude that such submission was harmless.

Second, the defendants claim that the trial court also should not have submitted to the jury interrogatories (c)

and (d), which referred to Anastasi's failure to perform a clinical pelvimetry and failure to evaluate Omar's size in utero, respectively, because there was not sufficient evidence adduced at trial to support those allegations. For the reasons set forth in this opinion, we conclude that the defendants' claim is without merit.

"In *Freedman* v. *New York, N.H. & H. R. Co.*, 81 Conn. 601, [612] 71 A. 901 (1909), this court observed . . . that the purpose of interrogatories was to elicit a determination of material facts, [and] to furnish the means of testing the correctness of the verdict rendered, and of ascertaining its extent. . . . The power of the trial court to submit proper interrogatories to the jury, to be answered when returning their verdict, does not depend upon the consent of the parties or the authority of statute law. In the absence of any mandatory enactment, it is within the reasonable discretion of the presiding judge to require or to refuse to require the jury to answer pertinent interrogatories, as the proper administration of justice may require. . . . The trial court has broad discretion to regulate the manner in which interrogatories are presented to the jury, as well as their form and content." (Citations omitted; internal quotation marks omitted.) *Viera* v. *Cohen*, 283 Conn. 412, 449–50, 927 A.2d 843 (2007). Moreover, "[i]n order to establish reversible error, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." *Bovat* v. *Waterbury*, 258 Conn. 574, 594, 783 A.2d 1001 (2001).

In its responses to the interrogatories, the jury did not find Anastasi negligent with respect to claim (b)—the failure to determine whether Tamar had a small pelvis—but did find Anastasi negligent with respect to claims (g) and (h)—the application of excessive traction and the failure to maintain accurate medical records, respectively. With respect to the latter two interrogatories, the jury found that the application of

excessive traction was a proximate cause of Omar's injuries, but that the failure to maintain accurate medical records was not a proximate cause of Omar's injuries. In its memorandum of decision, the trial court concluded that although it was improper to include interrogatories (b) and (h) and the unmodified version of interrogatory (g), the jury's responses "showed the jury to be deliberative and not confused and one [that] followed the court's instructions. The jury answers indicate that submission of allegations (b) and (h) had no effect on the result . . . ." Accordingly, the trial court concluded that such error was harmless.

With respect to interrogatories (b), (h) and (g), because there is no dispute that those interrogatories should not have been submitted to the jury, we focus solely on whether the error was harmful. "In a civil case, an error is harmful if it likely affected the outcome at trial." *Friezo* v. *Friezo*, 281 Conn. 166, 226, 914 A.2d 533 (2007). In the present case, the record indicates that the inclusion of interrogatories (b) and (h) and the unmodified version of interrogatory (g) did not affect the outcome of the trial. Indeed, as the trial court determined, the jury's responses indicate that it was deliberative and not confused about the issues. The jury found that Anastasi was not negligent with respect to interrogatory (b). Although the jury found, with adequate support in the record,[5] that Anastasi failed to maintain accurate medical records, as claimed in interrogatory (h), that finding did not affect the outcome because the jury found that such failure was not a proximate cause of Omar's injuries. Moreover, there is no evidence in the record to suggest that the inclusion of "pressure

[5] The issue of the accuracy of Anastasi's medical records was contested at trial. The plaintiffs showed that the records that Anastasi's office sent to Saint Francis Hospital and Medical Center did not indicate whether he had performed a pelvic examination on Tamar. Anastasi's office chart, however, did indicate that he had performed the examination.

and/or torsion" in interrogatory (g) had any affect on the jury's deliberation and verdict. The terms "traction," "pressure" and "torsion" often were used interchangeably throughout the trial by several witnesses and by the defendants' counsel.[6] In addition, the inclusion of "and/or" signifies that the jury was permitted to find the defendants liable solely on the basis of the amount of traction applied, of which there was ample support in the record. See *Kalleher* v. *Orr*, 183 Conn. 125, 126, 438 A.2d 843 (1981) ("[i]f . . . the jury could reasonably have decided as they did, we will not find error in the trial court's acceptance of the verdict").

Similarly, although the defendants claim that interrogatories (c) and (d), which refer to the failure to perform a clinical pelvimetry during labor and the failure to evaluate Omar's size in utero, respectively, should not have been included, the jury found that Anastasi was not negligent in either respect. In fact, interrogatories (b), (c) and (d) all referred to similar concepts, namely, whether Anastasi failed to ascertain whether Tamar's pelvis was too small or whether Omar was too big to be delivered safely via a nonoperative vaginal delivery. That the jury answered all three interrogatories consistently demonstrates that the jury was not confused. In short, cumulatively, the allegations set out in interrogatories (b), (c), (d) and (h) did not form the basis of the jury's verdict. Accordingly, we conclude that any error in the submission of those interrogatories to the jury, whether actual or alleged, did not likely affect the outcome, and was harmless.

## II

We next address the defendants' claim that the trial court improperly failed to order a new trial because

---

[6] For example, in his closing arguments, the defendants' counsel stated, "How do you quantify the amount of traction or pressure?" The defendants' counsel also referred to the amount of force used as "torque."

the jury's responses to interrogatories (e) and (f), which addressed whether Anastasi properly applied the vacuum extractor and whether Anastasi failed to perform a timely cesarean section, respectively, were internally inconsistent. Although the jury found in its answer to interrogatory (e) that Anastasi had improperly applied the vacuum extractor, it made no finding as to interrogatory (f), which inquired whether Anastasi had failed to perform a timely cesarean. The defendants claim that the jury's failure to answer interrogatory (f) with respect to the cesarean section claim renders the jury's verdict inconsistent because, as the defendants claim, the performance of a cesarean section was the only possible alternative to the application of the vacuum extractor. The trial court concluded that even if the defendants' claim had a "scintilla of logic" there is no harm because the jury also had found that Anastasi applied excessive traction after discovery of the shoulder dystocia. We agree.

"Our role in addressing this claim is extremely limited. The trial court's refusal to set aside the verdict is entitled to great weight in our assessment of the claim that its decision is erroneous. . . . The evidence and record must be given the most favorable construction in support of the verdict which is reasonable. . . .

"It is not the function of a court to search the record for conflicting answers in order to take the case away from the jury on a theory that gives equal support to inconsistent and uncertain inferences. When a claim is made that the jury's answers to interrogatories in returning a verdict are inconsistent, the court has the duty to attempt to harmonize the answers." (Citations omitted.) *Norrie* v. *Heil Co.*, 203 Conn. 594, 606, 525 A.2d 1332 (1987).

In the present case, there is no evidence that the jury's responses to the interrogatories were inconsistent. Although the jury found that Anastasi improperly

had used the vacuum extractor, it made *no finding* with respect to whether Anastasi had failed to perform a timely cesarean section. Because the trial court had instructed the jury only to answer an interrogatory if it were unanimous on the issue, the failure to make a finding regarding the cesarean section simply indicates that the jury was not unanimous on that issue. The failure to make a finding cannot be construed to be an express finding that Anastasi was not liable for failing to perform a cesarean. Moreover, at trial, the plaintiffs asserted two grounds in support of their claim that Anastasi improperly had used the vacuum extractor: (1) that Anastasi had utilized the extractor too early within the labor and delivery period;[7] and (2) that Anastasi had utilized the extractor too often.[8] A finding that Anastasi utilized the extractor too early in the labor is not inconsistent with the lack of a finding regarding the failure to perform a cesarean section. The jury reasonably could have found that applying the extractor before Omar had become engaged was a violation of the standard of care independent from a determination as to whether Anastasi should have performed a cesarean section.[9] In any event, as the trial court observed,

---

[7] According to the plaintiffs' expert, James Shwayder, an obstetrician and gynecologist, the location of a baby in the birth canal is designated by stations. When the baby is above the spine, the stations are designated as minus one, minus two and minus three. When the baby's head is level with the spine, the baby's location is designated as "zero" station and the baby is considered "engaged." When the baby is below the spine, the stations are designated as plus one, plus two and plus three. At trial, Katherine Piasecki, an attending nurse, testified that, prior to Anastasi's application of the vacuum extractor, the last known position of Omar was at minus one station. The plaintiffs' other expert, Yvonne Gomez-Carrion, an obstetrician and gynecologist, testified that it would be a breach in the standard of care to apply a vacuum extractor when a baby was at minus one station.

[8] Yvonne Gomez-Carrion testified that the standard of care with respect to the maximum number of pulls for a vacuum extractor is three. As noted previously in this opinion, the plaintiffs presented testimony that Anastasi pulled on the vacuum extractor six times.

[9] The record does not indicate that an emergency situation preceded the application of the vacuum extractor, which possibly could have justified a

even if an inconsistency did exist, any error was harmless because the jury also had found that Anastasi was negligent by applying excessive traction following the discovery of the shoulder dystocia. That claim existed independent of the claim with respect to the vacuum extractor and was alone sufficient to sustain the verdict.

### III

The defendants' final claim is that the trial court failed to order a remittitur of the economic damages awarded to Omar because the evidence did not support the award. We agree with the defendants and remand the issue to the trial court.

At trial, the evidence of the plaintiffs' economic damages primarily was presented by two experts, Lawrence Forman, a rehabilitation expert, and Gary Crakes, an economist. Forman testified that Omar's loss of earning capacity would be $14,367.66 per year on average over the course of his working life. Crakes testified that the present value of that lost earning capacity, after adjustments for income tax liability and fringe benefits, was $565,519 over that time period. In addition, on the basis of Forman's life-care plan, Crakes testified that

---

premature application. At trial, the plaintiffs' counsel and Anastasi had the following colloquy with respect to Omar's heart decelerations, which indicates that the timing of the application of the vacuum was not in response to an emergency situation:

"[The Plaintiffs' Counsel]: And for the first half hour or so of [Tamar's] pushing, she pushed and there were some fetal heart decelerations, right, Doctor?

"[Anastasi]: I believe so, there was.

"[The Plaintiffs' Counsel]: And that's not an unusual occurrence, is it?

"[Anastasi]: Not at all.

"[The Plaintiffs' Counsel]: Sometimes when a mom is pushing and the baby is coming down through the birth canal, there are decelerations because the baby is reacting to the stress of labor, right?

"[Anastasi]: Exactly.

"[The Plaintiffs' Counsel]: And there's nothing ominous about that, is there, Doctor?

"[Anastasi]: No, there is not."

he calculated the present value of Omar's future care costs at $524,355. Thus, according to the plaintiffs' experts, Omar's total discounted, after-tax economic loss was $1,045,874. In her closing argument, the plaintiffs' counsel asked the jury to return an award of economic damages in the amount of $1,020,117, but the jury awarded $1,588,000 in economic damages.[10]

"We review the verdict in this case in the light of certain principles. First, the amount of an award is a matter peculiarly within the province of the trier of facts. . . . Second, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption. . . . Third, the ruling of the trial court on the motion to set aside the verdict as excessive is entitled to great weight and every reasonable presumption should be given in favor of its correctness." (Citations omitted; internal quotation marks omitted.) *Pisel* v. *Stamford Hospital*, 180 Conn. 314, 342–43, 430 A.2d 1 (1980). Likewise, in "ordering a remittitur, a fair appraisal of compensatory damages, and not the limit of legitimate generosity, is the rule . . . ." *Brower* v. *Perkins*, 135 Conn. 675, 682, 68 A.2d 146 (1949). The court's broad power to order a remittitur should be exercised "only when it is manifest that the jury [has] included items

---

[10] As noted previously in this opinion, the jury also awarded Omar $1 million in noneconomic damages and Tamar $108,000 in noneconomic damages. In their postverdict motions, the defendants challenged all three awards as excessive. In denying their motion for a remittitur or new trial on damages with respect to the awards to the plaintiffs, the trial court stated that the awards were appropriate in light of Omar's injury, future life-care costs, lost earning capacity and loss of life enjoyment.

of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." *Rosenblatt* v. *Berman*, 143 Conn. 31, 37, 119 A.2d 118 (1955). Again, the "relevant inquiry is whether the verdict falls within the necessarily uncertain limits of fair and reasonable compensation or whether it so shocks the conscience as to compel the conclusion that it was due to partiality, prejudice or mistake." *O'Brien* v. *Seyer*, 183 Conn. 199, 208, 439 A.2d 292 (1981).

In light of the evidence presented at trial, we conclude that the jury's award of $1,588,000 for economic damages was not supported by the evidence. Although both Forman and Crakes testified about their analysis and calculations, neither expert's testimony supported an award in excess of the award that the plaintiffs sought, nor were either expert's reports made available to the jury. The plaintiffs contend that because the jury was aware that the experts' calculations were made on the basis of midpoints, the jury reasonably could have assigned a higher cost or loss of earnings to those calculations, and accordingly, reasonably could have rendered an award in excess of the award sought by the plaintiffs. That argument might have had merit if the jury had been presented with a range of costs or loss of earnings. In the present case, however, the plaintiffs did not present such a range. Even accepting that Crakes' calculation of $1,045,874 was a midpoint figure, it is unclear, without additional evidentiary support, whether the range from which that midpoint was derived was from approximately $1 million to $1.1 million or whether the range was from $500,000 to $1.5 million and so on. Thus, even if the jury's award reflected an intent to base the award on the high point rather than the midpoint of costs and loss of earnings, that intent could have been achieved only by speculation and not on the basis of evidence. A jury award not

supported by the evidence cannot stand. See *Rosenblatt* v. *Berman*, supra, 143 Conn. 37–38. Because there was no evidentiary support for the jury's award, we conclude that the trial court improperly denied the defendants' motion for remittitur.

Having determined that the court improperly denied the defendants' motion for remittitur, we next consider the appropriate remedy. The defendants request, in the alternative, that we should reverse the judgment of the trial court and order a new trial on all issues or require the plaintiffs to accept a remittitur in order to avoid a new trial on the issue of economic damages.

This court has a long history of ordering plaintiffs to accept a remittitur or submit to a new trial. See *Baldwin* v. *Porter*, 12 Conn. 473, 485 (1838); *Noxon* v. *Remington*, 78 Conn. 296, 300, 61 A. 963 (1905). As recently as *Gaudio* v. *Griffin Health Services*, 249 Conn. 523, 555–56, 733 A.2d 197 (1999), this court has ordered remittitur as an appropriate remedy. In *Gaudio*, we instructed the trial court to set aside the judgment awarding economic damages unless the plaintiff filed a remittitur, and specified that if the plaintiff "fail[ed] to file a remittitur within [the specified] period of time, then the judgment awarding economic damages [would be] set aside and a retrial . . . ordered, limited to the issue of economic damages." Id., 556. In the present case, as in *Gaudio*, we affirm the judgment as to liability, but remand the case for remittitur or, if the plaintiffs fail to file a remittitur, a new trial limited to the issue of economic damages.

The judgment is reversed only as to the amount of economic damages and a new trial is ordered unless the plaintiffs shall, within ten days of the official release of this opinion, file a remittitur of $542,126 plus offer of judgment interest.

In this opinion the other justices concurred.